<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| FREDDIE GRAHAM, | : | Civil Action No. 17-2956 (JMV) |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| PATRICK A. NOGAN, *et al.*, | : | |
| | : | |
| Respondents. | : | |
| | : | |

**Vazquez, United States District Judge**

### I.      INTRODUCTION

Petitioner Freddie Graham ("Petitioner"), a prisoner currently confined at East Jersey State Prison in Rahway, New Jersey, has filed a *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (D.E. 1.)  For the reasons explained in this Opinion, the Court will deny the Petition and will not issue a certificate of appealability.

### II.      FACTUAL BACKGROUND & PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division on Petitioner's direct appeal.[1]

> On the evening of August 9, 2006, M.M. went to the apartment in which her boyfriend, Evans, lived with his mother, who was not home at the time. M.M. and Evans watched television together in Evans' bedroom for about twenty minutes. Evans then left the room. A short time later, defendant, who was not known to M.M., entered the room and struck up a conversation with her. She noticed that

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

defendant had red splatters on his white shirt, which she believed were juice stains.

Defendant then brandished a knife, threatened M.M., and told her to undress. She complied. Defendant proceeded to lead her into the other bedroom, and showed her Evans' body lying in a pool of blood and appearing lifeless. Defendant then forced M.M. to fellate him. He stole her purse and its contents and tied her hands behind her back. Although M.M. later had no recollection of being beaten, she was knocked unconscious and later woke up in the hospital with multiple severe injuries, including a fractured skull and bruising of the brain.

Later that night, Evans' mother came home and saw M.M. in an unresponsive state in her son's bedroom, which was covered with blood. She immediately went to another apartment and called the police. When the police responded, they found M.M. unresponsive but alive and arranged for her transport to the hospital. The police also found Evans' body in the other bedroom. He was dead. Medical testimony established that Evans had been stabbed twenty-three times in the area of his chest. The wounds pierced his lungs, heart, and aorta. He also had lacerations on his head and hands. The medical examiner testified that Evans might have been unable to scream during the attack because blood blocked his airway.

The investigation led to defendant. He gave a statement to the police on August 21, 2006. He admitted that he had been at Evans' apartment that afternoon. He said he and Evans smoked crack cocaine together. He said he left at about 6:00 p.m., and Evans was alive and well.

M.M. had given a general description of her attacker. Defendant fit that description. When shown a photo array that included defendant's picture, she positively identified defendant as her attacker. She also identified him in court at trial.

Many witnesses testified in this lengthy trial, including some called by defendant. Defendant did not testify. In light of the issues on appeal, we find it unnecessary to recount any further factual details.

During the jury selection process, a prospective juror revealed that he had a vacation planned, with his departing flight scheduled for Monday, December 22, 2008. Both parties and the court anticipated the trial taking less time than it actually did, and therefore did not foresee the juror's travel plans becoming an issue. That individual was empaneled as juror number two.

2

The case was ready to be submitted to the jury on Thursday, December 18, 2008, and deliberations began just before noon on that day. Neither party had suggested that juror number two be designated an alternate because of his travel plans. After deliberating for a short time, the jurors were excused for lunch. They resumed deliberations at about 1:47 p.m. That afternoon, they requested and received a replay of a videotaped statement M.M. had given and a read-back of defendant's statement to the police.

The jury resumed deliberations on Friday, December 19, at about 9:35 a.m. At noon, the jurors were discharged because the courthouse was closing at 1:00 p.m. due to a snowstorm. As they were leaving, the jurors passed a note to the judge asking for a repeat of the definition of reckless manslaughter. Juror number two remained behind and reminded the judge of his travel plans for the following Monday.

When defendant's attorney was asked what his thoughts were about excusing the juror, he said, "I'm not happy with that, Judge." However, he did not object. The judge then urged counsel to discuss the matter with his client, and to review the advantages and disadvantages of continuing the trial with an alternate juror as opposed to requesting a mistrial. After that consultation, defendant told the judge he wanted to continue and did not wish to seek a mistrial. Again, defendant's counsel posed no objection and did not move for a mistrial.

By that time, the initially constituted jury had deliberated for about four hours and forty-five minutes. Without objection, the judge selected one of the alternates to replace the excused juror. Deliberations resumed with the newly constituted jury on Monday, December 22, 2008 at about 10:15 a.m. While instructing the new jurors about their obligations as a reconstituted jury (which we will discuss later), the judge said that he would not respond to the note requesting reinstruction on reckless manslaughter that had been given to him the previous Friday. He explained that the note was no longer operative because the previously constituted jury no longer existed.

At about 11:45 a.m., the jury requested reinstruction on circumstantial and direct evidence, and on the definition of reckless manslaughter. The judge responded to the request appropriately.

At about 12:25 p.m., the jurors issued a note stating: "[T]he Jury is at a deadlock. We cannot agree." The jurors were sent to lunch, and

returned at about 1:45. At 2:00 p.m., without objection, and without a request by either party for a mistrial, the judge instructed the jury to continue with its deliberations, correctly explaining the applicable principles as prescribed by the Supreme Court in *State v. Czachor*, 82 *N.J.* 392 (1980).

At about 3:40 p.m., juror number eleven advised the court that a family friend had died and she wished to attend the funeral the next morning at 11:00 a.m. The judge assured her that she would be accommodated. He said: "Don't worry about it, we'll take care of it. We're going to let you deliberate a little bit more. I don't know where the Jury stands, but we'll [be] bringing the Jury out shortly." The juror thanked the judge and returned to deliberations. Defense counsel then urged the court to deny the juror's request to attend the funeral, which the judge rejected.

At about 4:00 p.m., the jury reached its verdict. The newly constituted jury had deliberated for about four hours and thirty minutes, almost exactly the amount of time the first jury had deliberated.. . .

[Petitioner], was charged in a seven-count indictment with crimes arising out of events that occurred at the same time and place on August 9, 2006 in Paterson. The first two counts pertained to one victim, Wylie Evans, who was killed. Counts three through six pertained to another victim, M.M., who was sexually assaulted, robbed and beaten. The seventh count did not pertain to any particular victim.

More particularly, the charges were as follows: (1) first-degree purposeful or knowing murder, N.J. Stat. Ann. § 2C:11–3a(1) or (2); (2) third-degree possession of a weapon (a knife) for an unlawful purpose, N.J. Stat. Ann. § 2C:39–4d; (3) first-degree attempted murder, N.J. Stat. Ann.§ 2C:5–1 and N.J. Stat. Ann. § 2C:11–3; (4) third-degree possession of a weapon (a knife) for an unlawful purpose, N.J. Stat. Ann. § 2C:39–4d; (5) first-degree armed robbery, N.J. Stat. Ann. § 2C:15–1; (6) first-degree aggravated sexual assault, N.J. Stat. Ann. § 2C:14–2a(3) or (4); and (7) fourth-degree possession of a weapon (a knife) under circumstances not manifestly appropriate for such lawful uses as it may have, N.J. Stat. Ann. § 2C:39–5d.

The jury found defendant not guilty of the first three counts, and guilty of the remaining counts. After merging count seven with count four, which, in turn, was merged with counts five and six, Judge Marmo imposed sentence as follows: On count six,

> aggravated sexual assault, defendant was sentenced to an extended term as a persistent offender of thirty-years imprisonment with an 85% parole disqualifier pursuant to the No Early Release Act (NERA), N.J. Stat. Ann. § 2C:43–7.2. On count five, robbery, the judge imposed a concurrent term of twenty-years imprisonment subject to an 85% parole disqualifier pursuant to NERA.

*State v. Graham*, Indictment No. 07-03-0298, 2011 WL 1327412, *2–4 (N.J. Super. Ct. App. Div. Apr. 8, 2011).

The Appellate Division affirmed Petitioner's conviction. *Id.* at *7. The New Jersey Supreme Court denied certification on September 22, 2011. *State v. Graham*, 27 A.3d 952 (N.J. 2011).

Petitioner subsequently filed a petition for post-conviction relief ("PCR"), which the court denied on July 9, 2013. *State v. Graham*, Docket No. A-0479-14T4, 2016 WL 6833065 at * 1 (N.J. Super. Ct. Div. Nov. 21, 2016). On November 21, 2016, the Appellate Division affirmed the PCR court's decision. *Id.* at 7. On March 23, 2017, the New Jersey Supreme Court denied Petitioner's petition for certification.[2] (D.E. 1, at 12.)

Petitioner filed the instant § 2254 Petition on May 1, 2017. (D.E. 1.) Respondents filed their Answer on June 15, 2017. (D.E. 6.) Petitioner filed a reply on July 19, 2017. (D.E. 9.) On July 20, 2017, the Court entered an order approving Respondents' motion to seal state court records containing the sexual assault victim's name. (D.E. 8.) The matter is fully briefed and ready for disposition.

Petitioner raises the following claims in his federal habeas petition:

1. Ineffective assistance of counsel "[d]ue to a unreasonable determination of the facts in light of the evidence presented." (D.E. 1, at 6.)

---

[2] The Court was not able to locate the Supreme Court's denial of certification. Respondents also submit they do not have a record of Petitioner's certification denial and rely on Petitioner's submission. (D.E. 6, at 9.)

5

2.  The trial court erroneously replaced a juror after deliberations began.  (*Id.* at 2.)

3.  The trial court's instruction to the newly-reconstituted jury were misleading.  (*Id.* at 9.)

4.  Ineffective assistance of counsel as a result of trial counsel's failure to present expert testimony.  (*Id.* at 11.)

### III.    STANDARD OF REVIEW

Section 2254(a) permits a court to entertain claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts.  *See Renico v. Lett,* 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by

the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Parker v. Matthews*, 567 U.S. 37, 40–41 (2012) (quoting 28 U.S.C. § 2254(d)).  Moreover, AEDPA deference applies even when there has been a summary denial.  *Cullen v. Pinholster*, 563 U.S. 170,  187 (2011) (citation omitted).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))).  "Under the contrary to clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this [Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412–13 (internal quotation marks omitted).  As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen*, 563 U.S. at 180–81.

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).  Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. 2254(b)(1)(A). To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in a federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d. Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d. Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365–66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007)); *see also Gray v. Netherland*, 518 U.S. 152 (1996); *Coleman v. Thompson*, 501 U.S. 722 (1991)). In addition, if a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

## IV.     ANALYSIS

The instant Petition raises four grounds for relief.  For the reasons that follow, the Court finds that Petitioner's claims do not warrant federal habeas relief.

### A.     Trial Court Errors

In ground two of his federal habeas Petition, Petitioner asserts that the trial court erroneously replaced a juror after deliberations reached an advanced stage.  (D.E. 1, at 8.)  In ground three, he raises issues related to the instructions provided to the newly constituted jury. (*Id.* at 9.)

#### 1.   Juror Substitution

Petitioner asserts that the trial court erroneously permitted a juror to be substituted with an alternate juror after deliberations were well underway.  (D.E. 1, at 8.)  Respondents assert that Petitioner has not raised a valid constitutional claim and the state court's decision was consistent with state and federal court of appeals precedent.  (D.E. 6, at 21–24.)

Petitioner initially raised the instant claim on direct appeal.  *See Graham*, 2011 WL 1327412 at *1.  On habeas review, the district court must review the last reasoned state court decision on each claim.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on direct appeal.  The Appellate Division denied the claim as follows:

> The Defendant argues that it was plain error for the court to excuse juror number two because of his vacation plans, rather than *sua sponte* declaring a mistrial. Defendant is critical of the court for (1) not designating juror number two as an alternate at the commencement of deliberations, (2) failing to consider alternatives to excusing juror number two, such as bringing the jury back over the weekend, before juror number two's scheduled trip, and (3) substituting a new juror rather than declaring a mistrial when the deliberations had reached an advanced stage. We find these arguments unpersuasive.

9

As we have stated, defendant did not raise these objections during trial. We are thus guided by the plain error standard and will not reverse unless it is established that any error was clearly capable of producing an unjust result. *R.* 2:10–2. Not any possibility of an unjust result will suffice; the possibility must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Macon*, 57 *N.J.* 325, 336 (1971). Further, to the extent that defendant affirmatively endorsed the actions taken by Judge Marmo, the invited error doctrine applies. A defendant cannot urge a certain course of action at trial, and after that action is taken, but the outcome of the trial is deemed unfavorable, "'then condemn the very procedure he sought and urged, claiming it to be error and prejudicial.'" *State v. Kemp,* 195 *N.J.* 136, 155 (2008) (quoting *State v. Lykes,* 192 *N.J.* 519, 539 n. 7 (2007)); *see also State v. Jenkins,* 178 *N.J.* 347, 358 (2004).

We find no error, let alone plain error, in Judge Marmo's rulings. It was patently clear that requiring juror number two to remain on the jury in light of his travel plans would have constituted a significant hardship. Trial courts are authorized to excuse jurors "because of illness or other inability to continue" and replace them with an alternate if deemed appropriate. *R.* 1:8–2(d)(1); *State v. Valenzuela,* 136 *N.J.* 458, 476 (1994). Substitution of a juror does not impair a defendant's right to a fair and impartial jury if the reason for excusing the juror "'relate[s] exclusively to the personal situation of the juror himself and not to his interaction with the other jurors or with the case itself, [because] they are ordinarily not circumstances having the capacity to affect the substance or the course of the deliberations.'" *Valenzuela, supra,* 136 *N.J.* at 468 (quoting *State v. Trent,* 157 *N.J. Super.* 231, 239 (App.Div.1978), *rev'd,* 79 *N.J.* 251 (1979)).

The reasons for juror number two's excusal was clearly personal to him. Further, financial hardship can satisfy the "inability to continue" standard. *State v. Williams,* 171 *N.J.* 151, 167 (2002).

We next consider defendant's argument that the deliberations of the initial jury had reached an advanced stage, thus precluding reconstitution of the jury. Substitution of a new juror is improper if the jury is so far along in its deliberations that it would be unable to impartially begin deliberations anew. *State v. Corsaro,* 107 *N.J.* 339, 349–51 (1987). If the extent of prior deliberations has made recommencement "unreasonable," a mistrial may be a more appropriate exercise of the trial judge's discretionary authority. *Macon, supra,* 57 *N.J.* at 338.

Defendant argues that because the first jury requested reinstruction on reckless manslaughter, it must have already made important decisions as to defendant's guilt or innocence on the homicide charge. This hypothesis is unsubstantiated by anything in the record. Indeed, the newly constituted jury again requested the same instruction, and also requested instruction on direct and circumstantial evidence, which the first jury had not requested. The first jury had never reported or indicated through any of its questions to the court that it had reached a partial verdict, nor did it report a deadlock. The length of the first jury's deliberations is also not indicative of having reached an advanced stage. Defendant's argument in this regard is based on pure speculation, and we reject it.

We also find no impropriety in the manner in which the judge dealt with juror number eleven's request to attend a funeral the next day. Contrary to defendant's assertion of jury coercion, the record satisfies us that Judge Marmo allayed any concerns of the juror by assuring her that he would accommodate her. Indeed, the defense urged the court to disallow the juror from attending the funeral. It is obvious that the defense wanted this jury to complete its deliberations. Defendant cannot now assert error in this regard.

*Graham*, 2011 WL 1327412 at *4–5.

At Petitioner's trial, once deliberations were under way, a juror indicated he would need to be excused due to previously scheduled vacation plans. (D.E. 5-16, at 4.) The following colloquy occurred:

THE COURT: Okay, now you have to leave when, Tuesday?
JUROR: Monday.
THE COURT: Monday?
JUROR: I leave the 22nd, that's what I was saying.
THE COURT: Oh.
JUROR: I told you that.
THE COURT: Yea, I know you did, right. I misunderstood. When do you have to leave on Monday?
JUROR: In the morning, 8:00.
THE COURT: Oh. Okay. Just step into the jury room for a minute, don't be concerned. Just step into the jury room for a minute.

(Juror number 2, Mr. Mitchell, to jury room)

THE COURT:  All right, you know, I was thinking Tuesday, but he's right, the 22nd is Monday.  Now the Jury has only been deliberating since about something after 11:000 yesterday and they heard the readback and the playback, so we would have to replace --, but I have received, as the Jury is leaving, this is a note which we have to mark.  It came out just four minutes ago when we were discharging the jury and it says: "The Jury would like you to define reckless manslaughter."

I'm sure it means it would like you to define reckless manslaughter.  So it seems to me I have to let this Juror go, but that means we would have to use an alternate to replace them and that alternate would have to be briefed on what the Jury has talked about and covered up until we got to this point.  I don't think I would just – charge them with that until they've done that.

But I think we have to let Mr. Mitchell, I believe, Juror number two, go.  What are your thoughts?

MR. DEGROOT:  You have to let Juror number two go.
THE COURT: Mr. Kaplan?
MR. KAPLAN:  I'm not happy with that, Judge.
THE COURT:  Well, what do you suggest we do?  What's your application?  I'm not happy that it's snowing right now.
MR. KAPLAN:  I'm not happy that it's snowing out either.
THE COURT:  All right, but what's your application?
MR. KAPLAN:  I want him to stay.
THE COURT:  Well, I can't make the man stay. He's got a trip planned.
MR. KAPLAN:  So do I.
THE COURT:  And that might result in somebody that's not a very happy Juror either.  Okay.  Other than having him stay, let's bring Mr. Mitchell out.  He told us from the start that he had this planned on this day.  We thought the case was going to end over a week ago, it didn't.

(Juror number 2 returns to courtroom)

THE COURT:  Okay.  Mr. Mitchell, where tell us again where you're going?
JUROR:  --Montego Bay, Jamaica.
THE COURT:  Montego Bay, Jamaica.  Okay.  So you have reservations and plans and plane flight and everything and you told us about that right from the start.
JUROR:  Absolutely, from the first day when you had –
THE COURT:  Yes.

12

JUROR: --

THE COURT: Yes, you did. All right. We wouldn't keep you from that under all of the circumstances. Now your paperwork, I guess the Jury Assembly Room would send you that, wouldn't they?

SHERIFF'S OFFICER: --

THE COURT: You can't get it – you're not going to be able to get it today now, right, Tim? No. What do you do again, Mr. Mitchell?

JUROR: I'm a mechanic.

THE COURT: Okay. And who do you work for?

JUROR: Well, I'm not really working right now.

THE COURT: Oh, okay, all right. Because I do write a letter to employers when their employee is here for a long time and if you wanted a letter like that, I could do a letter like that for you, but if you're not working –

JUROR: That's all right.

THE COURT: Okay. So here's the important thing. We appreciate very much your being willing to do this.

JUROR: I wish I could hang on to finish.

THE COURT: Yes, I wish you could too, believe me very much. We just expected – almost never does the case go beyond what the lawyers think. This case went beyond that week, so we missed mark on this. That hasn't happened, I can't remember when. It did happen here, we missed the mark.

So—but we'll excuse you. Understand that what's important for you is that this is something that –people want to do. You didn't run away from this when it happened to you, it happened to fall on you, you were willing to do this. I hope you recognize and are gratified by the fact that you are willing to do that, spend this time with us, listen and just the case, all right?

Okay, so we hope you enjoy your trip. We'll excuse you from service with this case. I can't give you your papers to take with you, they will be sent to you.

JUROR: Okay.

THE COURT: All right? Okay, thank you again, Mr. Mitchell.

JUROR: All right, thank you very much.

(Juror exits)

THE COURT: And the Jury has been excused since Friday approximately at noontime. They began to deliberate on Thursday about 11:30, the best I can tell from my notes, and they had an extended—lunch was a little longer, I believe.

And then they did readback when they—in the afternoon or we played the video for them that's in the case, which was about 40 minutes – 40 some minutes on Thursday afternoon.

On Friday—we had a snowstorm Friday.  I believe they started deliberations about 20 to 10:00 and they were release at about 12:00.  But before they were discharged, we excused Juror number two who had told us from the beginning that he was going to be leaving the country actually, I believe, today, this morning.  We didn't, by agreement, take him out of the potential for being a deliberating Juror.  He became a deliberating Juror, even – even though we knew from the voir dire about his departing, but we expected the case was going to get to the Jury probably a week earlier than it actually did.

In any event, there are two issues which now come up.  Number one, whether or not he can be excused as constituting not able to continue.  I'm not as concerned about that question.  There is case law where a Juror was excused most recently because of financial hardships and this is certainly a financial hardship as well as for other reasons.

The other question is whether or not the Jury has deliberated to the point where it's not possible to reconstitute the jury by adding the alternate.  The cases of *State vs. Williams* and – that's an Appellate Division opinion and the Supreme Court's opinion in *Jenkins* are things we need to look at pursuant to the rule which is court rule 1:8-2D, I believe, which allows the Court to do that.

So I don't—I want to know initially what the Defense position is with regard to this, because—well, I don't want to say anymore right now.  What is the Defense position, Mr. Kaplan?

MR. KAPLAN:  Well, as you know, Judge –
THE COURT:  I want your position, not how you feel, whether you're not happy or unhappy, what your position is, I'd like your answer to my question.
MR. KAPLAN:  As to which issue?
THE COURT:  As to what we should do no, whatever your position is.
MR KAPLAN:  I think we have to continue.
THE COURT:  Okay.  So you're not asking for – you have no application for a mistrial or not to continue of the way things have developed?
MR. KAPLAN:  No.
THE COURT:  I want you to discuss this with your client, because I want to talk to Mr. Graham and have his opinion on this.  Here's

14

where – I frankly expected Mr. Kaplan would take that position, because it very well may be that the Defense has an interest in not losing this Jury.  The – I think the Defense was successful in certain things here that if we had to try this case again, they might not be able to get to this – the posture of the case where it is now.

The Jury has last asked for the definition of reckless manslaughter, which is the lowest form of homicide.  So I don't – we don't know what that means and we often are not in a position to make very intelligent conclusions about what a note means.  We've found from experience time and again that a note may suggest something and it's something very different.  But it may be something that is looked at in a positive way by the Defense

So the Court is in a catch 22 situation here, sort of.  Or between a rock and a hard place, because if the Court does not grant a mistrial, there can be argument that a mistrial should have been granted for either concern, either by reason of excusing Mr. Mitchell, number two, or by reason of allowing the Jury to be reconstituted.  However the Defense may – if the Court declares a mistrial, the Defense may claim they were deprived of a Jury which was looking like they were in a posture that was favorable to the Defendant.

So there has to be a way to deal with this that is not wrong, either of those two alternatives cannot both be wrong, so that this is a win/win situation on the Defense side of it.

So if I choose to go ahead with substituting in one of the alternates, I want it to be done after the Defense has gone over all of the ramifications or implications of this with Mr. Graham and then I want to know personally what Mr. Graham's position is and whether he understands that he won't be able to raise this issue, he's waiving it hereafter.

So let's do that and then I can do a few more of the matters on my calendar while I'm waiting to hear from Mr. Kaplan.  All right, do you want to be heard, Mr. DeGroot?

MR. DEGROOT:  No, Your Honor.
THE COURT:  All right.  Okay, so let's do some other matters from today's calendar which is quite big.
. . .

MR. KAPLAN:  Mr. Graham wants to continue with this process now.

15

THE COURT:  Okay.  And I know you've had quite a while now to talk to Mr. Kaplan about this, Mr. Graham, but I want to talk to you personally about this, because you're actually in control of this right now.

You could – we could cancel this trial and start it all over again, you understand, if you asked for a mistrial?

Or we could put a substitute—have a substitute for number two, Mr. Mitchell, who left and have the Jury continue deliberations with instructions that they need to start all over again, as if they just starting deliberations anew, so that this Juror can be a part of every—all of the deliberations.  So whatever has been said it, they need the best they can do to say that all over again, to disregard whatever conclusions, if any, they have come to and to start as if they're just beginning deliberations.  You understand?  That's essentially what I would be saying to them, you understand?

MR. GRAHAM:  Yes, Your Honor.

THE COURT:  All right.  Now, there are different ways of looking at this trial.  I suppose you could look at it and think the Defense is in a very strong-is in a good position right now.  You could also look at it and think the Defense is not in a good position right now.

Basically you have seen what happened at the trial, so you're in a position of knowing what you are able to do at this trial.  It's not like you haven't started the trial and seen what can happen.  You've seen what challenges have been made to the State's case, you understand.

MR. GRAHAM:  Yes, Your Honor.

THE COURT:  The last question the Jury—and the Jury hasn't been deliberating very much.  That's why I'm not taking it out of your hands.  When I go over the time that the Jury has actually been deliberating, it's very small.  Otherwise, if it was more than that, I could say I'm not letting you decide, I am deciding this Jury—we're going to start the case all over again.  You understand?

MR. GRAHAM:  Yes, I do understand that.

THE COURT:  The last thing the Jury said is they want reckless manslaughter.  That's a big departure from murder.  Your lawyer in fact, in the opening and closing statements just about conceded to the Jury that the only way you can look at this killing is it's a murder.  Somebody really wanted to kill this person, aside from the crimes against the female victim.  You understand?

MR. GRAHAM:  Yes, Your Honor.

THE COURT:  So you can look at this and say the Jury is having a hard time with the State's case, because they're considering reckless manslaughter, the lowest form of killing in this kind of horrific killing.  You understand?

MR. GRAHAM:  Yes, Your Honor.

16

THE COURT:  On the other hand you could look at this and say, this case was all about whether or not I'm the person who did, not what it is that happened, but who it – whether the State has proven that I'm the one who did.  And if the State (sic) is asking the Court to define one of the kinds of homicide, you could say well, there's people in there convinced that I'm the one who did it.

MR. KAPLAN:  You said State, Judge, I think you mean Jury.

THE COURT:  The Jury, thank you.  If the Jury is asking for a definition of one form of homicide, then you have to think or you could assume or speculate that they must believe that I'm the person who did it, because why would they be asking for this otherwise.  You understand?

MR. GRAHAM:  Yes, Your Honor.

THE COURT:  The Jury, thank you.  If the Jury is asking for a definition of one form of homicide, then you have to think or you could assume or speculate that they must believe that I'm the person who did it, because why would they be asking for this otherwise.  You understand?

MR. GRAHAM:  Yes, Your Honor.

THE COURT:  And our experience is that we're often not very good at being able to project what is going on in that Jury room, based on the notes that they're sending out.  So it's not something you can feel very comfortable about being able to judge.  Do you understand?

MR. GRAHAM:  Yes, Your Honor.

THE COURT:  Okay.  So I am satisfied of a couple of things.  Number one, without the Defense arguing that the case should be stopped and started all over again, I can allow this case to go on, because of Number one, how briefly the Jury has been deliberating.  And number two, the fact that I know this question doesn't necessarily mean that the Jury has come to any conclusions about the case.  And I'm satisfied that if I instruct them in the strongest terms and tell them they've got to start these deliberations from the very beginning and I'm not going to answer this question unless this new Jury wants it and I get a note from them, but I don't want them to hear that unless they've had at least at [sic] hour to have this new Juror begin the deliberations with her, bring the – to where they were.

That's the way I would handle it.  And I'm satisfied as long as you're asking me to do that, I would do it, because you have a right to say to me I don't want to be deprived of this trial and this Jury, I would be prejudiced by that.  And in effect, that's what you're saying.  You're saying to me I want you not to declare a mistrial, I want you to allow these deliberations to go ahead.  And I would be prejudiced if you kept this – took this Jury away from me, you understand?

17

MR. GRAHAM:  Yes, Your Honor.

THE COURT:  And what that means is that if the things turn about badly for you, later on you cannot say you should have declared a mistrial.  I'm not a lawyer, I don't know what to do, I relied on my lawyer, he gave me a bad advice, now I want to tell you that what should have happened is a mistrial should have been granted.  You're not going to be able to do that.  You understand?

MR. GRAHAM:  Yes, Your Honor.

THE COURT:  You're giving that right up.

MR. GRAHAM:  All right.

THE COURT:  Do you have any questions about any of this?  I know you spent a good deal of time with Mr. Kaplan before this trial, during this trial and even now after I raised this position of wanting to know you feel about this.  But if you have a question, you should ask it now, this is your time?

MR. GRAHAM:  No, Your Honor, I believe my lawyer has been quite thorough in explaining everything, so I have no questions, Your Honor.

THE COURT:  All right.  So you understand you can't complain about this later on if I allow this Jury to continue.

MR. GRAHAM:  I do understand, Your Honor.

THE COURT: All right.  Do you have any – any questions at all?

MR. GRAHAM:  No, sir.

THE COURT:  No?

MR. GRAHAM:  Not at all, Your Honor.

THE COURT:  All right.  Okay, let's bring the Alternates- are they here?

SHERIFF'S OFFICER:  Yes, they are.

THE COURT:  Okay, so we need to pick an alternate by putting two slips in the box, okay.  The rule is 1:8-2 something on this.  Let me just go to that for the record, for reference for the record.  I think 2D.  Okay.  And what is significant about 1:8-2D is – 1:8-2D(1), actually.  "If the alternate jurors are not discharged, that if any time after submission of the case to the Jury, a Juror dies or is discharged by the Court because of illness or other inability to continue, the Court may direct the Clerk to draw the name of alternate to take the place of the Juror who was discharged."

"If the alternate Jurors are not discharged, that if any time after submission of the case to the Jury, a juror dies or is discharged by the Court because of illness or other inability to continue, the Court may direct the Clerk to draw the name of an alternate to take the place of the Juror who was discharged."

All right.  So the word "draw" means to me – suggests that we select the Alternate the same way we designated alternates in the first

place, and that is by putting the two slips in the box, spinning the wheel and drawing out the Alternate's.

And as I said, I'm satisfied that Mr. Mitchell was appropriately discharged because it would have been terribly unfair and enormous hardship to him if we had not discharged him under the circumstances and because we all knew about Mr. Mitchell's situation from the start of the case. And because no one suggested to me that we should not discharge Mr. Mitchell when he was discharged.

Okay. So we need to bring the deliberating Jury out and the Alternates in and designate the alternate.

THE COURT CLERK: --

THE COURT: No. Thank you.

(Jury enters/Alternates enter courtroom)

THE COURT: Okay. All right, ladies and gentlemen, I – I don't know whether you're aware, but it was necessary for us to excuse Juror number two, through no fault of his own, but because it would have been terribly – a terrible hardship if I did not excuse him and it was understood that he would be excused.

So we need to replace that Juror with one of our Alternates, that's why we have Alternates. So the Clerk will go through the same process, let's find out which Alternate is going to now become part of the deliberating panel.

(Clerk spinning wheel, drawing name)

THE COURT CLERK: Juror number 14, Kathleen Russo.

THE COURT: Okay. All right, ladies and gentlemen, now it's important for you to understand how things need to work, now that you are a different unit than you have been up to this point. Because with the addition of the Alternate that's now part of the 12 deliberating Jurors, you have been reconstituted. You are not the same group you were up until this point. So what's required of you by law is that you disregard whatever conclusions or deliberations you have conducted up to this point and you begin your deliberations anew.

And the way that you can best do that is each of you, the best one to understand what was said, is the person who said it. So what each of you need to do, when you go back into the jury room and perhaps the Forelady can arrange for this, is that you go – you summarize for the new Juror things—have been said.

19

And the best way to do that is for each person to try to recall the observations that they made, so that you can make them again and the new Juror can have some input into each of that.

Now that last – what's on the table now is your last note which asks me to re-define reckless manslaughter.  That note came to me from a different 12—unit of 12 than what you are now, so I cannot honor that note at this point.  Whatever the new unit request of course we'll respond to it.  But I expect that you won't ask me for something until you've gone through that process that I've indicated to you, you need to go through before you ask for something or if you were to ask for the same thing again, that would have to come only after this particular deliberating unit comes to that very same point, all right?

So this is very important, I know it's unexpected for you, it's unexpected for us as well, but it's what we need to do in order for these deliberation to be fair and to comply with the requirements of law.

So we're going to ask you now to resume deliberations.  The officer will return the exhibits to you and I want you to being your deliberation brand new from the start.   Disregard whatever conclusions you came to previously.  You have to come to those conclusions together again with this new unit deliberating right from the onset.  All right?

So if you step into the jury room, you can now start your deliberations, we'll bring the exhibits in for you.

(D.E. 5-16, at 4–6; D.E. 5-17, at 3–10.)

"[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." *Riggins v. Nevada*, 504 U.S. 127, 149 (1992).  In the field of criminal law, "the category of infractions that violate 'fundamental fairness' [is defined] very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."  *Medina v. California*, 505 U.S. 437, 443 (1992).  In order to satisfy due process, Petitioner's trial must have been fair, but it need not have been perfect. *United States v. Hasting*, 461 U.S. 499, 508–09 (1983) ("T]here can be no such thing as an error-free, perfect trial, and [] the Constitution does not guarantee such a trial.").

20

Here, the state court's decision was not an unreasonable application of clearly established federal law. Petitioner has not raised a valid constitutional violation. While the Supreme Court has not addressed a claim of this nature, the United States Court of Appeals for the Third Circuit found that a trial court's decision to substitute a juror after initial deliberations began was not a violation of the Petitioner's constitutional rights. *See Claudio v. Snyder*, 68 F.3d 1573 (3d Cir. 1995). The Third Circuit recently reached the same conclusion. *United States v. James*, 955 F.3d 336, 348 (3d Cir. 2020) ("Because all deliberating jurors heard all of the evidence and were properly instructed, and there is nothing in the record suggesting that the deliberating jurors lacked impartiality or the competence to understand the evidence and the instructions, or that the excused juror tainted or otherwise impaired the reconstituted jury that delivered the verdict, the Court's substitution of Juror 8 with an alternate neither prejudiced James nor violated his Fifth Amendment due process right or Sixth Amendment right to an impartial jury.").

Petitioner has not demonstrated how the trial court's substitution of juror number two, within this context, violated his right to a fair trial. Although Petitioner argues the jury was in an "advanced stage" of deliberations when juror number two was excused, the trial judge clearly considered and articulated that the jury had not been deliberating for a significant period of time as a basis to discharge and substitute juror number two. As the state court pointed out in its opinion, the reconstituted jury deliberated for the same amount of time as the first jury. *Graham*, 2011 WL 1327412 at *4. Therefore, this claim is denied.

### 2. Jury Instructions

Petitioner also claims that the trial court provided misleading instructions to the reconstituted jury. (D.E. 1, at 9.) Petitioner does not identify which portion of the jury instructions he takes issue with. Petitioner's supporting arguments raise an issue related to *Brady v. Maryland*,

373 U.S. 83 (1963), that appears to be unrelated to this claim.  (*Id.* at 45.)  On direct appeal, the

Appellate Division denied the claim as follows:

> In his second point, defendant argues that the court committed plain error by failing to sufficiently instruct the jury to begin deliberations anew after replacing juror number two with an alternate. A finding of plain error in jury instructions "requires demonstration of '[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" *State v. Burns,* 192 *N.J.* 312, 341 (2007) (quoting *State v. Jordan,* 147 *N.J.* 409, 422 (1997)).

> Replacement of a juror after deliberations have begun requires an instruction that the jury begin its deliberations anew. *State v. Trent,* 79 *N.J.* 251, 257 (1979). In *Trent*, the trial court seated an alternate juror and instructed her to "continue with deliberations with the jury." *Id.* at 254. The Supreme Court found that "[t]he absence of any instruction at all on the necessity to recommence deliberations constitutes plain error of such magnitude as to call for the reversal of defendant's convictions." *Id.* at 257.

> As defendant correctly points out, Judge Marmo did not follow the model jury instruction. *See Model Jury Charge (Civil),* 1.16, "Alternate Juror Empaneled After Deliberations Have Begun; *R.* 1:8–2(d)" (2007). In particular, defendant is critical of the court's omission of this statement from the model charge: "You are to give no weight to any opinion which Juror # ——may have previously expressed in the jury room before he/she was excused."

> But the judge made clear to the jurors the essential requirements that they begin deliberations anew as a newly constituted body, and that any conclusions reached in the prior deliberations must be disregarded. . . .

> . . .

> Unlike in *Trent*, the judge gave a thorough and adequate instruction, advising the jurors of their duty to disregard any previously reached conclusions and begin deliberations anew as a newly constituted body. Defendant mistakenly argues that the judge erred in suggesting that each of the initial jurors share his or her observations with the new juror. Contrary to defendant's argument, this suggestion did not undermine the jury's duty to begin deliberations

22

> anew. The suggested procedure provided a sensible method of doing just that. Further, although the judge did not tell the jurors, as prescribed by the model jury charge, that they should disregard whatever had been said during earlier deliberations by the departing juror, the totality of the instruction conveyed that meaning. We find no error, let alone plain error, in the instruction.

*Graham*, 2011 WL 1327412 at *5–6.

State court jury instruction-related determinations are normally matters of state law and are not reviewable in federal habeas proceedings. *See Engle v. Issac*, 456 U.S. 107 (1982); *Henderson v. Kibbe*, 431 U.S. 145 (1977); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 309 (3d Cir. 1991).

> Only where the jury instruction is "so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie." *Id.* *6 "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72. Rather, the district court must consider " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' " *Henderson*, 431 U.S. at 154 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)). Moreover, "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state's court judgment is even greater than the showing required to establish plain error on direct appeal." *Id.* A habeas petitioner who challenges state jury instructions must "point to a federal requirement that jury instructions on the elements of an offense ... must include particular provisions" or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him." *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).

*Maloney v. Nogan*, No. 14-1548, 2017 WL 1404322 at *5 (D.N.J. Apr. 19, 2017).

Here, even if the trial court omitted one sentence or phrase from the model instructions, the instructions were clear that the jury was to begin its deliberations anew.  More importantly, Petitioner does not point to any violation of federal law vis-à-vis the instructions.

In light of the record before this Court, the state court's decision was not an unreasonable determination, nor was it contrary to clearly established federal law.  Accordingly, this claim will be denied.

**B.      Ineffective Assistance of Counsel Claims**

Next, the Court addresses Petitioner's ineffective assistance of counsel claims.  Petitioner was represented at trial by Mr. Steven Kaplan, Esq.

The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the defendant must show that counsel's performance was deficient.  This requirement involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Id.* at 687.  Second, the defendant must show that he was prejudiced by the deficient performance.  *Id.*  This requires showing that counsel's errors deprived the defendant of a fair trial.  *Id.*

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance."  *Id.* at 690.  In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  In addition, judges must consider the facts of the case at the time of counsel's conduct and must make every effort to escape what the *Strickland* court referred to as the "distorting effects of hindsight."  *Id.*  The petitioner bears the burden of showing that counsel's challenged action was not sound strategy.  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).  Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *Id.* at 694.  "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's

performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting *Strickland*, 466 U.S. at 697)).

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id*. In other words, federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

Grounds one and four both raise similar allegations of ineffective assistance as a result of counsel's purported failure to obtain medical and psychiatric experts to testify about how M.M.'s, (the victim) brain injury may have limited her recollection and ability to testify at Petitioner's trial. (D.E. 1, at 40.) Similarly, in ground four, Petitioner argues his counsel was ineffective for failing to obtain the victim's psychiatric examination or records "which would have shown that victim M.M. was not in a sound state of mind" and for failing to request a mental competency hearing prior to her testimony. (*Id.* at 46.)

The last reasoned state court decision with respect to this claim is the Appellate Division's affirmance of the PCR Court's decision. The Appellate Division denied the claim, as follows:

We first address defendant's argument the PCR court erred by rejecting his claim that his trial counsel was ineffective by failing to obtain and review M.M.'s "comprehensive medical records" in order to challenge M.M.'s ability to recall events and competence to testify. The PCR court concluded defendant failed to satisfy the second prong of the *Strickland* standard because he made no showing that had his trial counsel obtained the records, the result of the trial would have been different. *See Gaitan, supra,* 209 *N.J.* at 350 (finding that a court may first consider the prejudice prong of the *Strickland* analysis and dismiss a claim where no prejudice has been shown "without determining whether counsel's performance was constitutionally deficient"). We find no error in the court's rejection of defendant's claim.

The standard for determining the competence of a witness to testify is codified in *N.J.R.E.* 601. *State v. G.C.,* 188 *N.J.* 118, 132 (2006).

The *Rule* provides:

Every person is competent to be a witness unless (a) the judge finds that the proposed witness is incapable of expression concerning the matter so as to be understood by the judge and jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth, or (c) except as otherwise provided by [the rules of evidence] or by law.
[*N.J.R.E.* 601.]

"*Rule* 601 reflects 'the basic policy of our law that every person is qualified and compellable to be a witness and to give relevant and competent evidence at a trial.'" *G.C., supra,* 188 *N.J.* at 133 (quoting *State v. Briley,* 53 *N.J.* 498, 506 (1969)). Disqualification of a witness "should be the exception" to the "general rule that all persons should be qualified to testify." *Ibid.* (quoting *Germann v. Matriss,* 55 *N.J.* 193, 217 (1970)).

If able "to understand questions and to frame and express intelligent answers," a witness is qualified to testify under *N.J.R.E.* 601(a). *Ibid.* (quoting *State in Interest of R.R.,* 79 *N.J.* 97, 114 (1979)). To satisfy the requirements of *N.J.R.E.* 601(b), a witness must understand the duty to tell the truth "and that the failure to do so could result in adverse consequences." *Ibid.*

Defendant argues his counsel erred by failing to obtain records concerning M.M.'s injuries and treatment that would have supported a challenge to M.M.'s competence to testify at trial. We disagree. There was extensive trial testimony detailing M.M.'s serious

injuries, her treatment, and the effect of her injuries on her cognitive abilities and memory. His trial counsel was provided with records concerning M.M.'s hospital admission and subsequent treatment, and questioned M.M. and her physicians during trial concerning her physical and mental health issues and treatment.

M.M. was administered the oath and testified at trial in a direct and responsive manner. The record demonstrates that she understood the questions posed and provided responsive answers. There is nothing in her testimony showing she did not understand her obligation to tell the truth, evidencing an inability to comprehend the questions asked, or revealing an inability to communicate her responses.

Based upon the record, the PCR court correctly concluded defendant failed to establish that if his counsel had obtained different or additional medical records, there was a reasonable probability M.M. would have been deemed incompetent to testify. Defendant's argument to the contrary is based on speculation and is untethered to any evidence showing M.M. was not competent to testify. M.M.'s inability to recall certain events related to the crimes committed against her is insufficient to support a finding she was not competent to testify. *See Phillips v. Gelpke*, 190 *N.J.* 580, 590 (2007) (quoting *R.R.*, *supra*, 79 *N.J.* at 116) ("[Q]uestions concerning the [witness's] recall are ... relevant only insofar as they bear upon the weight which the factfinder places upon testimony that has in fact been given."). The PCR court therefore correctly concluded that defendant failed to demonstrate prejudice under the second prong of the *Strickland* standard based on any alleged failure of his counsel to challenge M.M.'s competence to testify at trial.

*Graham*, 2016 WL 6833065 at *4–5.

Petitioner does not proffer any argument or evidence to support the premise that expert testimony or a competency hearing would have undermined M.M.'s testimony. M.M. sustained a skull fracture and bruising of the brain as a result of the incidents for which Petitioner was found culpable. Less than a month after the attack, a psychiatrist noted M.M.'s diminished cognitive functions. By the time she was discharged from the hospital, she was able to identify Petitioner as her assailant. At Petitioner's trial, more than two years after the assault occurred, M.M. provided an in-court identification of Petitioner. Nonetheless, trial counsel conducted a vigorous cross-

examination of M.M., which included significant questioning about her injuries and what if any psychiatric treatment she received.  (D.E. 5-8, at 61–71; D.E. 5-9, at 25–34.)

In light of the record demonstrating M.M.'s ability to identify Petitioner both shortly after the incident and more than two years later, as well as her ability to understand questions and be responsive during her testimony, Petitioner has not demonstrated how counsel's failure to furnish further evidence of M.M.'s brain injuries would have changed the outcome of the proceeding. Moreover, as the Respondents argue, Petitioner's argument that this evidence may have shown the extent of M.M.'s brain-related injuries and consequently her ability to testify, is purely speculative. Therefore, the state court's decision was not an unreasonable determination, nor was it contrary to clearly established federal law.  Petitioner's claim is thus denied.

## V.    CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter.  *See* Third Circuit Local Appellate Rule 22.1.  The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Based on the discussion in this Opinion, Petitioner has not made a substantial showing of a denial of a constitutional right, and this Court will not issue a certificate of appealability.

## VI.   CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied, and the Court will not issue a certificate of appealability.  An appropriate Order follows.

Dated: November 23, 2020

JOHN MICHAEL VAZQUEZ
United States District Judge

28